## Case No. 513.

### The · A. R. DUNLAP.

#### [1 Lowell, 350.][1]

District Court, D. Massachusetts.   July, 1869.

MARITIME LIENS—SUPPLIES—STEVEDORE'S LIEN—
ORDER OF PAYMENT—ATTACHMENT.

1. If it be necessary for libellants to show that the owners of a vessel were not in good credit at the time the supplies were furnished, evidence that the vessel was attached for a common-law debt of the owners in a foreign port, and that they did not dissolve the attachment, and that the master, who was a part-owner, was obliged to mortgage his share. of the vessel to procure her release, is sufficient proof of a want of credit.

[Cited in The Tangier, Case No. 13,744; The Clotilda, Id. 2,903; Nippert v. The Williams, 39 Fed. 826.]

2. If a vessel is attached in a foreign port in a suit at common law against the owners, money advanced to pay this debt does not constitute a lien on the vessel, although the owners had no funds, and the master could obtain the release of the vessel in no other way.

[Cited in The Clotilda, Case No. 2,903; Nippert v. The J. B. Williams, 42 Fed. 542.]

3. The taking of a mortgage by persons furnishing supplies as collateral security does not prevent their enforcing the lien given by the maritime law.

[Cited in Nippert v. The Williams, 39 Fed. 828.]

4. Money advanced to pay a debt which is a lien on the vessel, constitutes a lien.

5. A stevedore has no lien on a vessel.

[Cited in The Tangier, Case No. 13,744; The Benjamin English, Id. 1,306; The E. A. Barnard, 2 Fed. 715; The Gilbert Knapp, 37 Fed. 211. Disapproved in The George T. Kemp, Case No. 5,341; Roberts v. The Windermere, 2 Fed. 726; The Canada, 7 Fed. 119, 121.]

6. The decision in the case of The Antarctic, [Case No. 479,] as to appropriation of payments, does not apply to a running account, and require the creditor to satisfy all the items for which he has no lien. In such a case the law will appropriate the payments to the items in the order of their dates.

[Cited in The Illinois, Case·No. 7,005.]

7. The case of Pratt v. Reed, 19 How. [60 U. S.] 359, discussed.

[Cited in Nippert v. The Williams, 39 Fed. 828.]

In admiralty. Supplies furnished a Nova Scotian vessel in New York.—The vessel was attached in New York in a suit in a common-law court for a debt of two of the owners. The master, who was owner of one-third of the vessel, after writing to his owners and finding that they could do nothing to release the vessel, borrowed a sum of money from the libellants to pay this common-law debt, and gave a mortgage upon his share of the vessel to secure this sum, and also to secure them for supplies which they were to furnish the vessel to enable her to go to sea. These supplies were furnished, and supplies were also furnished at subsequent times on different voyages. The master

[1][Reported by John Lathrop, Esq., and here reprinted by permission.]

from time to time paid the earnings of the vessel to the libellants who gave him credit on account. The vessel was afterwards proceeded against in rem in Boston, and mortgagees of the shares of the vessel not owned by the master appeared as claimants. The vessel not being released on bail, and no security for her value being given, she was sold by order of court under the eleventh admiralty rule and her proceeds paid into court.

John Lathrop, for libellants.

1. The libellants are not bound as a part of their case in chief to prove that the owners of the vessel had no credit in New York, and that the supplies could not have been obtained upon their personal credit. The interpretation put upon the case of Pratt v. Reed, 19 How. [60 U. S.] 359, by Judge Sprague in The Sarah Starr, [Case No. 12,-354.] and since followed by this court, is erroneous, and the court is respectfully asked to reconsider it. In Pratt v. Reed, [supra,] there was no evidence that the coal had been supplied on the credit of the vessel, and the libel was properly dismissed. The term "necessity for a credit," which is used by the court in that case, has been interpreted to mean that the libellant must, in the first instance, show that there was such a necessity, and that the owner had no credit. By the law, as it was understood before Pratt v. Reed, [supra,] a necessity for a credit was presumed. The libellant started with this presumption. The claimant of the vessel might rebut it by showing that the master had funds which he ought to use and that the lender knew it, or that the master was guilty of fraud and the lender connived at it. It is true that the court in Pratt v. Reed, [supra,] said: "But the more serious difficulty in the case on the part of the libellant is the entire absence of any proof to show that there was also a necessity, at the time of procuring the supplies, for a credit upon the vessel." This may refer to the libellant's evidence in chief, or to his evidence in reply. If to the former, the case has changed a well-established rule of law. If to the latter, no change has been made. That this form of expression does not necessarily denote. that the evidence in chief was meant, is conclusively shown by the language of the court in a case decided at the same term: Thomas v. Osborn, 19 How. [60 U. S.] 22, 31. In that case the rule is thus stated by Mr. Justice Curtis: "To constitute a case of apparent necessity, not only must the ·· ·pairs and supplies be needful, but it must be apparently necessary for the master to have a credit to procure them." If the learned judge had stopped here, it might well be argued that the libellant must show the necessity for a credit in the first instance, but he continues: "If the master has funds of his own which he ought to apply to purchase the supplies which he is bound by the contract of hiring to furnish himself, and if he has funds of the

owners, which he ought to apply to pay for the repairs, then no case of actual necessity to have a credit exists. And if the lender knows these facts, or has the means, by the use of due diligence, to ascertain them, then no case of apparent necessity exists to have a credit, and the act of the master in procuring a credit does not bind the interest of the general owners in the vessel." This is but a statement of the rule laid down in the case of The Aurora, 1 Wheat. [14 U. S.] 96, 103, where Mr. Justice Story said: "No presumption should arise that such repairs and supplies could be procured upon any reasonable terms, with the credit of the owner, independent of such hypothecation. If, therefore, the master have sufficient funds of the owner within his control, or can procure them upon the general credit of the owner, he is not at liberty to subject the ship to the expensive and disadvantageous lien of an hypothecatory instrument." Here is a clear recognition of the rule that there is no presumption that supplies or repairs can be procured on the credit of the owner, and that this must be shown as a matter of defense. From all these cases it is submitted that the term "necessity for a credit" means merely that if the master has funds and the lender or person furnishing supplies knows it, this may be shown in defence. See The Virgin, 8 Pet. [33 U. S.] 554; The Neversink, [Case No. 10,-133;] The James Guy, [Id. 7,196;] same case before Judge Benedict, [Id. 7,195;] The Belfast, 7 Wall. [74 U. S.] 624. See, also, The Grapeshot, 9 Wall. [76 U. S.] 129.

2. That the owners of the vessel had no credit is fully proved.

3. The money advanced to pay the debt of the owners of the vessel and to release her from arrest constitutes a lien. If the money had not been advanced the vessel must have been sold in New York. See The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409. The master might have given a bottomry bond to release the vessel from arrest: The Vibilia, 1 W. Rob. Adm. 1; Smith v. Gould, 4 Moore, P. C. 21; The Edmond, Lush, 211, 220.

4. The lien was not waived by the taking of collateral security: The Kimball, 3 Wall. [70 U. S.] 37; Carter v. The Byzantium, [Case No. 2,473;] The St. Lawrence, 1 Black, [66 U. S.] 532; The Nestor, [Case No. 10,126;] The St. Mary, [Id. 12,242;] The West Friesland, Swab. 454; The James Guy, [Case No. 7,195.]

5. Money advanced to pay for supplies constitutes a lien: Thomas v. Osborn, 19 How. [60 U. S.] 28.

6. Stevedore's bills constitute a lien: The Medora, [Case No. 9,391;] The Circassian, [Id. 2,722.] In the latter case such a claim would have been allowed had it not been for two cases which were considered as precedents the other way, viz.: The Amstell, [Id. 339;] The Joseph Cunard, [Id. 7,535.] The Amstell was decided on two grounds, 1st. That the labor was performed partly on land and partly on board the vessel; 2d. That credit was not given to the vessel. The first ground is incorrect in law: Wortman v. Griffith, [Id. 18,057.] The second does not apply here, because in our case credit was given to the vessel. In The Joseph Cunard, [supra,] the vessel was chartered and the libellants sought to recover the amount of a bill of exchange drawn by the master in favor of the charterers' agent for disbursements made by the agent at Mobile. The owners of the vessel had an agent at Mobile whose duty it was to attend to all charges against the ship, and the master was specially instructed not to draw bills on the owners for disbursements, and this was known to the charterers and their agent. The case was properly decided on these grounds, and the remarks of the judge are merely dicta.

J. C. Dodge, (T. K. Lothrop, with him,) for the mortgagees.

There never was a lien upon the vessel for any part of the libellants' claim.

In order to create a maritime lien upon a vessel for supplies, there must exist,—

1. A necessity for the supplies themselves; such a necessity as arises only under very special circumstances, and in an unforeseen and unexpected emergency.

2. A necessity for the credit upon the vessel. It must appear affirmatively that the supplies could not be had upon the credit of the owner.

The necessity for the supplies and for the credit must be such necessity as would justify the master in taking up money on a bottomry of the vessel: Pratt v. Reed, 19 How. [60 U. S.] 359. I am well aware that the principles above stated are at variance with those upon which courts of admiralty have usually proceeded, but they are all of them established by the supreme court of admiralty in the case cited above, and some of them in Thomas v. Osborn, Id. 22, and must therefore now be regarded as settled.

A bottomry bond made by the master is invalid if it were possible for him before making it to communicate in a reasonable time with his owner: La Ysabel, 1 Dod. 273; Wallace v. Fielden, 7 Moore, P. C. 398. So if the master have funds of the owner in possession or within reach, or can borrow on the personal credit of the owner: 1 Pars. Shipp. & Adm. 143, 144, and cases cited; The Golden Rose, [Case No. 1,658.] So if the bond were given by the master to relieve the vessel from arrest under legal process founded upon a claim that did not itself constitute a lien upon her: The Aurora, 1 Wheat. [14 U. S.] 96; The Osmanli, 3 W. Rob. Adm. 198; The Augusta, 1 Dod. 283, 288; The Yuba, [Case No. 18,193;] The North Star, Lush. 45; The Edmond, Id. 57, 66.

We have seen that the foregoing rules of law, well settled in regard to bottomry bonds, are equally applicable to an implied lien:

Pratt v. Reed, ubi supra. Now, looking at the case before the court in the light of these principles, we find,—1. There existed no special circumstances or unforeseen emergency. The vessel was not wrecked nor in distress. The case stands simply upon the ground that she was in a foreign port and needed ordinary supplies. 2. The master might have communicated with his owner and had a reply by mail in a week, by telegraph in an hour. 3. It is not shown, or attempted to be shown, that the owner had not credit in New York when the supplies were furnished. On the contrary, it may be inferred that he had, from the fact that the amount annexed to the libel shows a large remittance from the libellant to the owner. Again, no implied lien would arise unless it was so intended by the parties, or at least, unless the libellants, when they furnished the supplies, intended to rely upon a lien. The fact that they took a mortgage on the property shows that they had no such intent or understanding. The mortgage conveyed the property to them, and a man cannot be presumed to intend a lien upon his own property. Or if he once had a lien, the taking the mortgage was a waiver of the lien. The express lien created by the mortgage is inconsistent with the implied lien now claimed: The Ann C. Pratt, [Case No. 409;] The Nestor, [Id. 10,-126;] The Chusan, [Id. 2,717;] Ramsay v. Allegre, 12 Wheat. [25 U. S.] 611; Fish v. Howland, 1 Paige, 20; Little v. Brown, 2 Leigh, 353. If for any of the items of the libellants' bill there ever was a lien upon the vessel, the payments made on account, and not specifically applied by the debtor or creditor at the time of payment, must be regarded as applied by the law to such items: The Antarctic, [Case No. 479.]

There are several items in the account annexed to the libel for stevedore's bills. It is settled that a stevedore has no lien upon the vessel for his services. It follows, of course, that the libellant could acquire no lien by paying for such services. The stream cannot rise higher than the fountain.

LOWELL, District Judge. This brig was owned in Nova Scotia, and the libellants, who reside in New York, present a bill for the disbursements, as they are called, of the brig, furnished by them at New York upon the request of the master, and for a certain other sum of money lent to him, as is presently more fully set forth.

The first part of the case has brought into discussion, as usual, the decision of Pratt v. Reed, 19 How. [60 U. S.] 359. That case has been understood to decide that a material-man, in order to maintain his lien, must bring himself within the rule applied to a lender on bottomry, and show not only that the supplies were necessary for the ship, or appeared to be so, but that the master had not, or appeared not to have, funds of the owner in hand to pay for them, and al-

so that the owner had no personal credit on which they could be procured at the place where they were furnished: The Sarah Starr, [Case No. 12,354;] The Sea Lark, [Id. 12,579;] The James Guy, [Id. 7,195;] The Neversink, [Id. 10,132, Id. 10,133.] Accordingly, the main issue in all these cases of late years has been whether the owner had such credit, and judges have been somewhat astute in ascertaining in each particular case that he had not. My own opinion has been guided by those above cited, and I have followed the course of inquiry pointed out in them. A more careful scrutiny of the leading case has brought me to doubt whether it professes to lay down any such principle.

It must be remembered that material-men have often nothing to do with credit at all, any more than other mechanics. If a ship-wright puts a new spar into a foreign ship, he expects payment when his work is done. He cannot exact it beforehand, because his labor is furnished from day to day, and the amount is neither liquidated nor due until the last day's work is done. If the master then neglects or refuses to pay him, he brings his libel. It is mere mockery to tell him that the owner is a man of good credit. That is only one more reason why his bill should be paid. The mechanic cannot transmute the owner's credit into money, and the master will not. It is for this reason that he brings his suit, and it is altogether a novel answer to a suit that the person liable to pay is able but unwilling to do so. Such an answer as that, of course, merely amounts to telling the creditor to seek redress at the home of the debtor, which is what he never contracted to do. It was to save him from this necessity, which in most cases would be a total denial of justice, that the lien of material-men was established throughout the mercantile world; and it is for this reason, probably, that in England and America it is confined to foreign vessels. The contracts of material-men are not really maritime, at least many of them are not; they are, in their reason and origin, much more like those of an unpaid vendor than like an ordinary maritime lien. In England the lien has always existed, though for nearly two centuries it was in a state of suspended animation, because the superior courts would not enforce it, nor permit the admiralty courts to do so. The statute 3 & 4 Vict. c. 65, § 6, gave the court of admiralty jurisdiction of suits for necessaries furnished to foreign vessels in English ports, and thereupon the liens became operative, although there is not a word in the statute about liens; and the court has ever since enforced these well-known maritime liens, and every decision of that court which upholds such a lien is necessarily a decision upon the general maritime law of liens, as well as upon the statute. Now, in the numerous and important cases which have been reported in that

court on this subject since that statute was passed, no one has appeared bold enough to argue that the credit of the owner has any thing to do with the matter; and it is safe to say that no one ever will take that point, because one main purpose of the act was to save material-men the inconvenience of being obliged to resort to the foreign owner to recover a just debt payable at their own home and not at his. Laws are made for the enforcement of contracts according to their terms against persons in good or bad credit. If the mechanic, in the case supposed, had made inquiry and found that the owner was in good credit, what then? Is he therefore not to put in the spar until he is paid a sum as yet uncertain, contrary to all sense and usage? This example merely illustrates the reason and principle out of which the lien of material-men has grown. The same law applies to the ship-chandler who has agreed with the master for cash on delivery, but whom the master has cheated of his cash after receiving his goods. That the owner has credit, or even that the master has funds, only makes his position the stronger. He asks for his fair dividend of the funds according to his contract. Nor is it any answer to him that by the law of some states and countries he may attach the ship in a common-law action, and hold it as security for his debt. The jurisdiction of the common-law courts is not exclusive. It is no defence to a libel that the libellant has a remedy at common law. And if it were, this remedy is often delusive; for the attachment in most of the cases which have come under my notice would amount to nothing, because the class of vessels that come here from the British provinces are almost always mortgaged for more than they are worth in this market, and the mortgage takes precedence of the attachment. The remedy is not adequate; besides, it exists equally whether the owner's credit is good or bad. It is a mode of enforcing payment of comparatively recent origin, of limited use, and by no means calculated to supersede the old admiralty remedy. I cannot suppose, therefore, that the decision of Pratt v. Reed, [19 How. (60 U. S.) 359] was intended to apply to material-men who have given no credit at all.

If the material-man has given credit, he must show that the master had not, or appeared not to have, funds of the owner in hand wherewith to pay for them; because it is an elementary principle of the law of agency that the agent cannot pledge his principal's credit when he has, with the knowledge of the creditor, funds of the principal to apply to the immediate payment of the debt. Not that the law of lien depends always upon that of agency, but in this instance it does. But when this is shown, when it appears that the supplies were necessary and that a credit was necessary, the common law pledges the credit of the owner, and the maritime law that of the vessel; just as it does to a seaman or a shipper of goods, neither more nor less. Of course, it is a valid defence to an asserted lien to aver and prove that the personal credit of the owner, and that only, was pledged; just as it would be to a suit by a shipper of goods, and might be even to a seaman's libel under some very peculiar circumstances. But it is no defence to say that the personal credit of the owner would have been sufficient, when in fact it was not relied on.

The lender on bottomry stands on a wholly different foundation. He is agreeing for a credit to be liquidated at the home of the ship-owner; and he must furnish that credit at the lowest market rate. As he has agreed to be paid at the home of the owner, and as a solvent owner can be compelled to pay his debts at home, the law says that the lender shall not charge the unusual, and often almost ruinous, marine interest which is allowable in bottomry, if the money can be obtained at the usual rates and on the personal credit of the owner. This is the reason, and the only reason, that the rule in question has been adopted in bottomry law. The very foundation of the right of the master to borrow on bottomry in one class of cases is, that he must pay the material-men whose contract entitles them to payment in the foreign country, and who have a charge on the ship. But the doctrine of the owner's personal credit does not apply to them, for the reasons I have stated, and for those given by Judge Sprague in The Sarah Starr, [Case No. 12,-354,] cited above, to which I refer.

If then the case of Pratt v. Reed [supra] is to be understood as Judge Sprague and other district judges have understood it, the law is not only new, but it creates this anomaly: that if one of our vessels is repaired or supplied in the British provinces, and a suit is brought in this court by the material-men, my only inquiry must be whether the materials were furnished, and were necessary; but if the case is reversed, the parties remaining the same, and our merchants have supplied the foreign vessel, I must superadd an inquiry, which the creditors did not concern themselves with, whether the ship-owner in the provinces was a man of good commercial standing in his parish. This is not equality nor reciprocity, nor is it sound maritime law. I shall therefore, perhaps, find it my duty to cause such a case to be reviewed by the circuit court whenever the facts render it necessary, for I confess to grave doubts notwithstanding the opinions to the contrary, including my own as expressed on former occasions, whether the supreme court intended to decide anything more than that when a credit was given it must be shown that a credit was necessary. It is, perhaps, more probable that they overlooked for the

moment the distinction between bottomry loans and the debts due material-men, than that they intended to establish a strict analogy between them in this respect.

In this case the largest item of the account is for money furnished to the master, for which the libellants took a mortgage on his part of the vessel. This money was raised to relieve the vessel from an attachment in a court of common law, at the suit of a creditor of the remaining owners. There is no pretence that the debt, thus paid, was a charge on the vessel; and the libellants are driven to maintain that the master may always hypothecate his vessel to re-lieve her from any detention which inter-feres with the prosecution of his voyage, and not only so, but that such an hypothe-cation will be implied. The maritime law contains no such term as that. It is true, as I said before, that bottomry bonds have been upheld when they were given to re-lieve the vessel from debts which by the law of the country where the vessel was lying would be a charge upon her, though they would not be such, or at least could not be enforced as such, at the home port. But I do not recollect that this doctrine has ever been applied to debts contracted before the last voyage. Even if it has, no law has ever given to the master authority to hy-pothecate the ship for personal debts of the owners, unrelated to the ship or its naviga-tion. By the law of New England, and in a modified form, by that of most of our States, personal property may be attached and held as security for any debt of its owner. But there is no maritime lien on the prop-erty so attached, by reason of the attach-ment, nor does the fact of attachment give an agent of the owner an authority which he would not otherwise have, to hypothecate it for payment of that debt. The master of a ship is an agent, whose duties and pow-ers are well understood and defined. It is no part of his authority to hypothecate his ship for the general debts of the owner. Nor did he undertake to do so in this case. On the contrary, he gave a mortgage of his own share of the vessel, and an agreement that the ship should be consigned to the libel-lants, from time to time, till the freight should have paid the debt. This agreement he did not fulfil, and the libellants must ob-tain their indemnity, if the mortgage proves insufficient, by such personal action as they may be able to maintain. For most of the items of that part of the account which were furnished before the vessel sailed on her last voyage, and which are shown in sched-ule B., there appears to be a lien. If it be material that the owners were not in good credit, the attachment and mortgage show that they were unable to pay their debts, and were obliged to resort to extraordinary means to satisfy their creditors, even to pledging the property of their master. Un-der any construction of Pratt v. Reed,

[supra,] the libellants could maintain this part of their case. They have been careful, prudent, and diligent. No doubt they relied largely on the freight for their security, but this does not exclude the conclusion that they also relied on the vessel. The cases cited by the libellants establish this point. Each item of schedule B. has been carefully scrutinized by counsel, and fully discussed. The general rule in this country is that the person who advances money to pay the debts which are liens on the ship has himself a lien for his reimbursement: Thomas v. Osborn, 19 How. [60 U. S.] 22; The Gustavia, [Case No. 5,876;] and this is now the law of England, with some refinements and dis-tinctions not necessary to be here examined. Perhaps the rule has grown out of the doc-trine of subrogation. But whether so or not, the lender of money has not usually any more ample remedy than the material-men themselves would have had. See Davis v. Child, [Id. 3,628.] It has been decided in several cases, that a stevedore has no lien on the ship: The Amstel, [Id. 339;] The Jo-seph Cunard, [Id. 7,535;] The S. G. Owens, [Id. 8,748.] The reason given by some of the learned judges, that the contract is not maritime, does not appear to be decisive, be-cause the contracts of other material-men are no more so. The lien is for supplies and repairs to enable the vessel to perform her voyage, and only in that sense are they mari-time. The other reason, that the cargo is a collateral matter and no part of the neces-sary equipment of the vessel itself, is more to the purpose, though not satisfactory, be-cause a ship cannot be used to advantage without a cargo. But it is important to ad-here to decided cases, and I shall follow these, though I doubt their correctness as applied to foreign vessels, and should be glad to have the point reviewed by the cir-cuit court. In England, the stevedore may arrest the ship under the statute of Victoria: The Waban, cited 1 Pritch. Adm. Dig. 364, tit. "Material-Men," 71. Advertising the ves-sel for charter has likewise been decided not to create a charge on the vessel. Pilot-age and towage are maritime services for which there was a lien on the vessel.

The mode in which the payments should be appropriated, has been discussed at the bar. Judge Sprague decided that when the creditor had two distinct debts, and money was paid him generally without specific ap-propriation, it was his duty to apply it in the way most beneficial to the debtor, which, in that case, required an appropriation to extinguish a builder's lien: The Antarctic, [Case No. 479.] This rule does not apply to a running account, and require the cred-itor to satisfy first all those items for which he has no lien. To such an account the gen-eral rule applies, that, if there is no appro-priation at the time, the law will apply the payments to the items, in the order of their dates. Applying this rule, a considerable

part of schedule B. has been paid, if I understand the account. Those that remain, and for which there is a lien, on the principles above stated, can be recovered by the libellants, with costs. Interlocutory decree for the libellants.